USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUL 19 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Paul Fila, *et al.*,

                Plaintiffs,

—v—

Pingtan Marine Enterprise Ltd., *et al.*,

                Defendants.

15-cv-267 (AJN)

MEMORANDUM & ORDER

---

ALISON J. NATHAN, District Judge:

    Plaintiffs bring this securities fraud action on behalf of a putative class of those who acquired stock in Pingtan Marine Enterprise Ltd. ("Pingtan Marine") between June 17, 2013, and November 10, 2014. During that period, Plaintiffs claim Pingtan Marine falsely represented that it received profits from a Chinese fishing company, when in reality those profits remained in the fishing company's hands. The complaint alleges (1) securities fraud against Pingtan Marine and several of its officers and directors under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and its implementing regulation Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) control person liability against the officer and director defendants, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, Defendants' motion to dismiss is GRANTED.

I.    **Background**

    The following facts are taken from the complaint and other documents the Court is permitted to consider in evaluating a motion to dismiss. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Allegations in the complaint are assumed to be true for purposes

of resolving the motion to dismiss. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

Pingtan Marine is a Cayman Islands company headquartered in China. Am. Compl. ¶ 24. Its securities are traded on the NASDAQ stock exchange. *Id.* ¶ 19. Defendant Xinrong Zhuo is Pingtan Marine's founder, CEO, chairman of the board, and controlling shareholder. *Id.* ¶ 25. Defendant Roy Yu is Pingtan Marine's CFO. *Id.* ¶ 26. Defendants Lin Bao, Yeliang Zhou, Zengbiao Zhu, Xuesong Song, and Jin Shi were directors of Pingtan Marine during the relevant period alleged in the complaint. *Id.* ¶¶ 27–32.

Pingtan Marine is a shell company created to give American investors access to Chinese companies (and vice versa). Chinese law prevents wholly foreign-owned companies from having direct ownership of Chinese companies in certain "strategic" industries. *Id.* ¶ 52. To work around this law, Chinese companies can contract to delegate all management decisions and remit all net profits to a foreign-owned holding company. *Id.* ¶¶ 51–52. The Chinese-owned company that actually generates the revenue and carries out the business operations is called a "variable interest entity" or "VIE." *Id.* ¶ 51. Pingtan Marine employs this corporate structure. *Id.* During the relevant period, Pingtan Marine had no business of its own. *Id.* ¶ 50. Instead, it was the sole owner (through several layers of subsidiaries in various countries) of Pingtan Guansheng Ocean Fishing Co. Ltd. ("Guansheng"), a holding company incorporated under Chinese law. *Id.* ¶¶ 45–48. Until February 9, 2015, Guansheng (and thus Pingtan Marine) had the right to manage and receive net profits from Fujian Provincial County Ocean Fishing Group, Ltd. ("Pingtan Fishing"), a Chinese-owned fishing business. *Id.* ¶ 49. Xinrong Zhou, Pingtan Marine's CEO, chairman, and controlling shareholder, was also the beneficial owner and exclusive controller of Pingtan Fishing. *Id.* ¶ 79. Until December 2013, Pingtan Marine also had the right (through a similar structure of subsidiaries and contracts) to manage and receive net profits from a Chinese-owned dredging corporation. *Id.* ¶¶ 55–57. Pingtan Marine had no other sources of revenue during this period. *See id.* ¶¶ 43, 53, 56.

Although Guansheng (and thus Pingtan Marine) was entitled to all net profits from Pingtan Fishing, it did not receive them. *Id.* ¶¶ 120–21. Instead, all the money remained with Pingtan Fishing. *See id.* ¶¶ 115–41. Pingtan Fishing made over $45 million in net profit in 2013, and over $85 million in 2014. *Id.* ¶¶ 85, 87. These unpaid profits account for almost 50% of the income Pingtan Marine reported to the SEC in 2013, and 100% of the income it reported in 2014. *Id.* ¶ 84. Plaintiffs allege that Pingtan Marine concealed this state of affairs through misleading statements in its SEC filings indicating that Pingtan Fishing was paying its net profits to Guansheng. *Id.* ¶¶ 95–114.

On June 12, 2014, an amateur securities analyst named Michael Sacerdote published an article on the website *Seeking Alpha* entitled "Fishy Business at Pingtan Marine Enterprise" (the "Sacerdote article"). *Id.* ¶ 71; *see* Defs.' Ex. 5 ("Fishy Business"). The piece was publicly disseminated the next day. Am. Compl. ¶ 71. Sacerdote analyzed Pingtan Marine's public SEC filings and voiced numerous concerns about the company's books and management. Specifically, Sacerdote identified the following issues: (1) Pingtan Marine's "particularly cumbersome" VIE structure, which Sacerdote suggested was designed "so that money will never move from [Pingtan Fishing] to [Pingtan Marine]"; (2) a large number of related-party transactions (many involving the CEO's relatives); (3) the company's purchase of 46 fishing vessels from the CEO's wife at between eight to ten times the market price; (4) the company's legal problems in China; (5) the company's formation through a reverse merger; (6) the lack of a reliable auditor; and (7) the lack of employees qualified to follow SEC rules and proper accounting practices. Fishy Business at 12–13, 15; *see* Am. Compl. ¶¶ 71–72, 188–90.

In the wake of the Sacerdote article, Pingtan Marine's share price tumbled. At the start of June 13, 2014, the day the piece became public, Pingtan Marine shares traded for $3.12. Am. Compl. ¶ 196. By the end of the day, the price had dropped 25% to $2.47 per share. *Id.* ¶ 191. On November 6, 2014, Pingtan Marine announced that it would restate its financial statements for 2012 and 2013, and provide additional disclosures regarding the purchase of vessels from the CEO's wife. *Id.* ¶ 192. The company filed its restated financial statements with the SEC on

3

November 10, 2014. *Id.* ¶ 194. The stock price continued to fall in response to these announcements. *Id.* ¶¶ 193, 195. At the close of business on November 10, 2014, Pingtan Marine's stock traded at $1.19 per share, a more than 60% decline from the beginning of June 13, 2014. *Id.* ¶ 196. On February 29, 2015, Pingtan Marine assumed direct ownership of Pingtan Fishing, ending the VIE relationship. *Id.* ¶ 182.

Plaintiffs brought this suit against Pingtan Marine and the individual Defendants on January 14, 2015. Defendants moved to dismiss the Amended Complaint on September 11, 2015.

## II. Legal Standard

When a party moves to dismiss under Rule 12(b)(6), the pleading will withstand the motion so long as it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Regardless of the level of factual detail provided, if "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," then the Court will dismiss the case. *Twombly*, 550 U.S. at 558. A court evaluating a motion under Rule 12(b)(6) must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Although pleading most claims requires only that a party provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), claims of fraud are required by Rule 9(b) to "state with particularity the circumstances

4

constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, a party alleging fraud must "(1) specify the statements that the [claimant] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Additionally, because the complaint alleges securities fraud, Plaintiffs must also plead scienter (the intention to deceive, manipulate, or defraud) with particularity, as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). To plead scienter with particularity, a complaint must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u–4(b)(2)).

In addition to the text of the complaint, the Court may consider documents attached as exhibits, incorporated by reference, or that are "integral" to the complaint, as well as public SEC filings. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).

### III.    The Complaint Fails to State a Claim for Securities Fraud

In order to state a claim for securities fraud under Section 10(b) and Rule 10b–5, a complaint must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). As will be explained below, Plaintiffs have failed to identify a material misrepresentation or omission, and failed to plausibly allege loss causation.

### A. Pingtan Marine's SEC Filings Were Not Materially Misleading

Plaintiffs have failed to plead facts plausibly alleging that Defendants made a material misrepresentation or omission. A statement or omission is misleading if "the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). A misrepresentation or omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (brackets omitted). In other words, a material misstatement or omission is one that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

Plaintiffs allege that Pingtan Marine's public SEC filings were misleading because they falsely indicated that Pingtan Fishing was paying its net profits to Guansheng. Pingtan Marine's 2013 Form 10-K stated that "[u]nder the VIE Agreements, we, among other things, fully control Pingtan Fishing's business operations, policies and management, approve all matters requiring shareholders' approval, and receive 100% of the annual net income earned Pingtan Fishing [sic]." Defs.' Ex. 1 at 10. Similarly, it represented that "[a]s consideration for its business management services . . . Pingtan Fishing pays to [Guansheng] 100% of the net profits of Pingtan Fishing." *Id.* at 11. Plaintiffs also allege that Pingtan Marine's quarterly reports (Form 10-Qs) filed with the SEC from February 2013 onwards were materially misleading because they omit the fact that Pingtan Fishing never paid its net profits to Guansheng. Defs.' Exs. 3–4; Am. Compl. ¶¶ 112–14.

Taken in isolation, these statements—particularly the use of "pay" and "receive" in the present tense—imply that Pingtan Marine was receiving Pingtan Fishing's profits. Defendants argue that that both of the statements Plaintiffs point to are simply descriptions of the contract relationship between Pingtan Marine and Pingtan Fishing. Defs.' Br. at 12. The first statement makes explicit that it is describing Pingtan Marine's rights "[u]nder the VIE agreements," while

6

the second is part of an explanation of the terms of the Contracted Management Agreement between the companies. Defs.' Ex. 1 at 10–11. But even if this characterization is technically correct, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). If these statements comprised the entirety of the relevant portions of the 2013 Form 10-K, the Court might conclude that Pingtan Marine materially misled investors about the disposition of Pingtan Fishing's profits.

However, the Court does not view these statements in isolation, but rather alongside Defendants' other "representations, taken together and in context." *Rombach*, 355 F.3d at 172 n.7. Pingtan Marine's public SEC filings made quite clear that all profits from Pingtan Fishing would remain in China indefinitely. In explaining Pingtan Marine's dividend policy, the 2013 Form 10-K states that "[w]e currently intend to retain all available funds and any future earnings for use in the operation and expansion of our business and do not anticipate paying any cash dividends on our ordinary shares for the foreseeable future." Defs.' Ex. 1 at 28; *see also id.* at 23 ("We do not, [sic] anticipate paying any cash dividends on ordinary shares and plan to retain earnings, if any, for use in the development of the Company or our business."). In describing deferred income taxes applicable to undistributed earnings of Pingtan Fishing, the 2013 Form 10-K states that Pingtan Marine has not recorded any such taxes "because it is the present intention of management to reinvest the undistributed earnings indefinitely in [China]." *Id.* at F18. Similarly, Pingtan Marine's Form 10-Qs state that the overwhelming majority of its cash reserves are in China, and that its "intent is to permanently reinvest these funds in [China] and we have no plans to repatriate these funds." Defs.' Ex. 3 at 47; Defs.' Ex. 4 at 54.

Taken together, Pingtan Marine's public SEC filings should have made clear to any reasonable investor that the profits from Pingtan Fishing would remain in China and be reinvested in the company's business operations. Indeed, this is exactly the conclusion Sacerdote drew in his article. After reviewing much of the language just quoted, Sacerdote

observed that "whatever cash moves into Pingtan Fishing's accounts from business operations will stay in China and never come to the NASDAQ-listed entity, Pingtan Marine Enterprise. US shareholders should ask themselves what they actually own." Fishy Business at 13. "[I]n light of the significant and thorough cautionary language" in the public filings, Pingtan Marine's description of its relationship with Pingtan Fishing "did not constitute an untrue statement of material fact as a matter of law." *Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 CIV. 851 (RPP), 2009 WL 185940, at *13 (S.D.N.Y. Jan. 23, 2009).

      Plaintiffs do not directly disagree with any of the above. Instead, they retreat to a much more technical argument: that the statements in the 2013 Form 10-K were misleading because Pingtan Fishing's profits never formally passed through Guansheng's accounts before being reinvested back into Pingtan Fishing. Pls.' Br. at 7–9. Even assuming that this state of affairs renders statements made in the 2013 Form 10-K misleading, Plaintiffs have not plausibly alleged that such misrepresentations would be material. That is so because regardless of whether Pingtan Fishing's profits were ever moved to Guansheng's books, the underlying state of affairs described in the public filings remains the same: Pingtan Fishing's profits remained in China for use by Pingtan Fishing, and Pingtan Marine had no intention of bringing those funds out of China or making them available to US shareholders in any way. Indeed, this situation was alarming to Sacerdote even though he had no information regarding whether profits had temporarily passed from Pingtan Fishing to Guansheng or not. *See* Fishy Business at 13. Plaintiffs claim that "if Pingtan Fishing never turned its earnings over to [Guansheng], U.S. investors would be concerned that [Pingtan Fishing CEO] Xinrong Zhuo and his family may have been looting the Company and their investments in the Company." Pls.' Br. at 10. But Xinrong Zhuo is the CEO, chairman of the board, and controlling shareholder of Pingtan Marine, Am. Compl. ¶ 25, as well as the beneficial owner and exclusive controller of Pingtan Fishing, *id.* ¶ 79. Plaintiffs do not explain why the act of briefly passing Pingtan Fishing's profits through Guansheng's accounts would have impeded Xinrong Zhuo from looting the company, if that was what he sought to do. Accordingly, they have failed to plausibly allege—even by the more

lenient standards of Rule 8(a)—a misrepresentation or omission that a reasonable shareholder would likely consider important in deciding how to act. *See ECA*, 553 F.3d at 197. For this reason alone, the securities fraud claim must be dismissed.

### B. The Sacerdote Article is Not Sufficient to Plead Loss Causation

A second, independent reason to dismiss Plaintiffs' securities fraud claim is the complaint's failure to plausibly allege loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007). To adequately plead loss causation, a complaint must plausibly allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). The loss must be both foreseeable and caused by the materialization of a risk concealed by the misrepresentation. *Id.* In a case like this one, where the complaint alleges that misstatements and omissions were exposed by a corrective disclosure, "a plaintiff must point to a statement that, because it corrected a prior falsehood, precipitated a change in the security's price causing his loss." *In re China Organic Sec. Litig.*, No. 11 CIV. 8623 JMF, 2013 WL 5434637, at *7 (S.D.N.Y. Sept. 30, 2013).

Plaintiffs cannot use the Sacerdote article to plausibly allege loss causation because it is based solely on public information. The Second Circuit has held that to establish loss causation, a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *see Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortgage Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (summary order) (applying *Omnicom* at the motion to dismiss stage). "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512. But that is all Plaintiffs have offered here. The Sacerdote article is explicit that

it represents only the author's "effort to summarize and interpret the SEC filings," rather than any independent investigation. Fishy Business at 15. Sacerdote goes on to state that

> I have sought to summarize a few points from the company's SEC filings and make my best interpretation. When I read the filings, I personally lost confidence in the company. However, my personal degree of confidence is just that: a personal opinion. Readers should rely on their own due diligence drawn from the original source documents.

*Id.* The article could not be more explicit that it represents precisely the sort of "negative journalistic characterization of previously disclosed facts" that cannot be the basis for loss causation in this Circuit. *Omnicom*, 597 F.3d at 512; *see, e.g., Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud[.]").

Plaintiffs attempt to salvage their case by arguing that Sacerdote contributed new information to the market through his special "insight and expertise." Pls.' Br. at 20. Plaintiffs point to Sacerdote's observation that Pingtan Marine's corporate structure has an extra layer of subsidiaries between the NASDAQ-listed company (Pingtan Marine) and the Chinese holding company (Guansheng) "not usually present" in similar corporate structures. Fishy Business at 13. Of course, Pingtan Marine fully disclosed this corporate structure in its filings. What Plaintiffs claim was new is the comparison to "how other U.S.-listed Chinese companies employ the VIE structure." Pls.' Br. at 19. But this too is widely-available information that "added nothing to the public's knowledge" about where Pingtan Fishing's profits went. *Omnicom*, 597 F.3d at 512. Indeed, Sacerdote disclaims any specialized business knowledge, stating that "I am not a financial or legal professional." Fishy Business at 15. Virtually any analysis of public filings requires reference to public background facts regarding accounting, corporations, business practices, and so on. Additional widely-available public information is not sufficient to turn an analysis of public SEC filings into a corrective disclosure. *See, e.g., Turner v. MagicJack VocalTec, Ltd.*, No. 13 CIV. 0448, 2014 WL 406917, at *3, (S.D.N.Y. Feb. 3, 2014) (report

revealing that Defendants omitted $5 million class action suit pending against them from SEC filings was not a corrective disclosure because it relied only on public sources).

Plaintiffs' authorities do not alter this conclusion. Plaintiffs draw on *In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006), and dicta in *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009), which state that corrective disclosures can be based on public information if that information (or its implication) is not well-disseminated into the market. However, these are district court cases that predate *Omnicom*. Insofar as they express a different view of the legal standard for loss causation, they are no longer persuasive authority.

Plaintiffs' other authority, *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 292 (S.D.N.Y. 2004), is not relevant to this case. Although *Fogarazzo* provides support for the (uncontroversial) proposition that reports consisting of opinion and analysis of public information can influence stock prices, it says nothing about when such influence can be causally linked to a corporation's prior misleading statements. *See Meyer v. Greene*, 710 F.3d 1189, 1200 (11th Cir. 2013) (analysis of public information moved stock prices because of analyst's reputation rather than because a misstatement was corrected). Plaintiffs have failed to adequately plead loss causation because the complaint does not identify a viable corrective disclosure.

Even if Plaintiffs could somehow evade the requirement that their purported corrective disclosure must reveal new facts, they would still be unable to establish loss causation. The complaint does not plausibly allege that the decline in Pingtan Marine's share price following the Sacerdote article occurred "because [the article] corrected a prior falsehood." *China Organic*, 2013 WL 5434637, at *7. Although Plaintiffs need not "rule out other contributing factors or alternative causal explanations" at the motion to dismiss stage, they must still "allege enough facts regarding their loss to support the inference that they would have been spared all or an ascertainable portion of that loss absent the fraud." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) (internal quotation marks omitted). "[W]here

11

(as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk," Plaintiffs must allege facts sufficient either "to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss," or "to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell*, 396 F.3d at 177.

In order to meet this standard, Plaintiffs would need to plausibly allege facts sufficient to support an inference that Pingtan Marine's purported fraud, rather than Sacerdote's discussion of public information from the company's SEC filings, proximately caused their loss (or at least an identifiable portion of it). Specifically, there are two sets of "salient factors" from the public filings that may have caused Plaintiffs' loss. First, as discussed above, Pingtan Marine's public filings disclosed that Pingtan Fishing's profits would remain in China, inaccessible to US investors. Sacerdote's concerns about this arrangement were based on these explicit representations, rather than suspicion of fraud. On the contrary, Sacerdote wrote that "I want to emphasize that I am not accusing Pingtan Marine Enterprise . . . or management of any wrongdoing," Fishy Business at 15, and even noted that the company's filings are "surprisingly candid" about the legal difficulties awaiting US investors attempting to get their hands on the company's Chinese cash reserves, *id.* at 13. Second, concern over the disposition of Pingtan Fishing's profits is only one of seven major problems identified in the Sacerdote article. Fishy Business at 15. Plaintiffs do not attempt to link the other six problems to any material misrepresentation. It was Sacerdote's other concerns, and not the issue of Pingtan Fishing's profits, that Pingtan Marine addressed when it restated its financial statements for 2012 and 2013. Am. Compl. ¶¶ 192, 194. Pingtan Marine's stock fell significantly after each restatement. *See id.* ¶¶ 193, 195–96. Only after these restatements did Pingtan Marine take direct ownership of Pingtan Fishing, ending the VIE relationship and alleviating concerns about Pingtan Fishing's profits. *Id.* ¶ 182.

Plaintiffs have not alleged any facts to support an inference that Defendants' alleged fraud caused the drop in stock prices, rather than Pingtan Marine's publicly-declared intent to

12

keep profits in China, or the other problems discussed in the Sacerdote article. Nor have Plaintiffs alleged facts sufficient to apportion their loss between the alleged fraud and Defendants' public disclosures. Accordingly, the complaint must be dismissed for failure to show loss causation. *See Lentell*, 396 F.3d at 177.

### IV. The Control Person Liability Claims Fail Because Plaintiffs Have Not Plausibly Alleged Any Underlying Securities Fraud

Having dismissed Plaintiffs' securities fraud claim, the Court must also dismiss their claims against Pingtan Marine's officers and directors for control person liability under Section 20(a) of the Exchange Act. To state a claim under Section 20(a), Plaintiffs "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Because Plaintiffs have failed to allege a primary violation of the securities laws, their claims for control person liability necessarily also fail, and are therefore dismissed. *See, e.g., China Organic*, 2013 WL 5434637, at *12.

### V. No Sanctions Are Warranted

The PSLRA requires the Court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). The legal claims and defenses presented in this action were not frivolous under existing law. The factual contentions had evidentiary support or were reasonably based on belief or lack of information. No sanctions under Rule 11 are therefore warranted. *See, e.g., China Organic*, 2013 WL 5434637, at *12.

13

## VI. Conclusion

For the reasons set forth above, the motion to dismiss is granted. This resolves Dkt. No. 28. The Clerk of Court is instructed to close the case.

SO ORDERED.

Dated: July 19, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge